WISE, Presiding Judge.
The appellant, Kenneth Eugene Billups, was convicted of capital murder for the killing of Stevon Lockett. The murder was made capital because he committed it during the course of a first-degree robbery. See § 13A-5-40(a)(2), Ala.Code 1975.
After a sentencing hearing, by a vote of 7-5, the jury recommended that Billups be sentenced to imprisonment for life without the possibility of parole. The trial court overrode the jury’s recommendation and sentenced him to death. Billups filed a motion for a new trial, which the trial court denied. This appeal followed.
Because this is a case in which the death penalty has been imposed, we have reviewed it for plain error. See Rule 45A, Ala. R.App. P. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
Misty McReath testified that the victim, Stevon Lockett, whose nickname was “T,” *1040 was her boyfriend and that they were living together in December 2003. She also testified that, on the night of December 12, 2003, the victim was getting ready to go hunting the next morning. She further testified that she had bought the victim a handgun, which was later identified as a Highpoint 9 mm, and that the victim always had it with him.
McReath testified that, during the evening of December 12, 2003, the victim received several calls on his cellular telephone, but did not answer them because he did not want to go anywhere that night. However, later, he answered his telephone a few times, told her he “had to go make a run,” and said he would be right back. McReath explained that, when the victim said he was going to “make a run,” he meant that he was going to meet someone to buy or sell drugs. She also stated that the victim left between midnight and 12:30 a.m. and that he had his gun and $5,400 with him. The State presented records from the victim’s cellular telephone that showed several incoming calls from and outgoing calls to Billups’s cellular telephone on December 12-13, 2003.
McReath testified that she had seen Billups on several previous occasions when the victim had bought drugs from him or sold drugs to him. She also testified that she had been to Billups’s house on Old Springville Road with the victim. McReath testified that, one or two months before the victim was killed, Billups sold him something that was supposed to be cocaine but was actually sugar; that the victim and Billups had gone to the person from whom Billups had bought the substance, and the person made it right; and that the person told the victim to deal with him in the future rather than going through Billups.
The State presented evidence that, at approximately 3:15 a.m. on December 13, 2003, Officer Lincoln Blue of the Birmingham Police Department responded to a report about a pickup truck that was on fire in an alley in the East Lake area. Fire department personnel put out the fire and discovered the dead body of the victim in the back seat of the truck. Because it had been burned extensively, the victim’s body was identified using dental records.
The State also presented evidence that, on December 16, 2003, four Hispanic men — 27-year-old Manuel Nunez, 25-year-old Rafael Salcedo, 24 year-old Enrique Marquez, and 20-year-old Wilbur Gomez — were killed at Osman Valladres’s residence at Avanti East Apartments. Valladres and Pablo Stuart were able to escape from the apartment and reported the incident to law enforcement officers.
Osman Valladres testified that, on December 16, 2003, he and Pablo Stuart went to Billups’s house on Old Springville Road to get some marijuana. When they went into the kitchen, Billups, his girlfriend, Quinton Parrish, and Charles Cooper pulled guns on them, duct taped their hands, and made them telephone some people and tell them to bring marijuana and cocaine to his apartment. They all then went to his apartment and telephoned the other people again. He testified that the men talked about robbing and killing the Hispanic men when they got there.
Valladres testified that two men came to the apartment, saw some money, and said they would bring the drugs. Later, four Hispanic men arrived with approximately thirty-five pounds of marijuana. Valladres testified that Billups and Quinton started shooting the four Hispanic men and that he ran out of the apartment and subsequently contacted law enforcement authorities.
Sergeant Robert Thompson of the Jefferson County Sheriffs Department testi *1041 fied that he responded to Valladres’s apartment on December 16, 2003. He also testified that Billups became a suspect after he spoke to Stuart and Valladres, that he obtained a warrant to search Billups’s residence at 5918 Old Springville Road, and that the warrant was executed on December 17, 2003. At that time, officers found the victim’s Highpoint 9 mm handgun and some marijuana between a mattress and box spring in Billups’s brother’s bedroom. They also found duct tape that matched that described by Stuart and Val-ladres and papers related to Robina Catri-na Courthers. Thompson testified that United States Marshals eventually located Billups in Iowa with Courthers. Finally, he testified that he was not looking for and did not see any blood when he searched Billups’s residence on December 17, 2003.
Dr. Gary T. Simmons, a forensic pathologist for the Jefferson County Coroner/Medical Examiner’s Office, performed an autopsy on the victim’s body. He testified that the victim suffered six gunshot wounds to the head and face, including four to the left side, one to the right side, and one to the back of the head. He also testified that, based on his examination of the victim’s body, he believed the victim was already dead when the fire started.
Simmons testified that he received the bodies of the four Hispanic males on December 16, 2003. He also testified that Nunez died of three gunshot wounds to the back of his head; that Salcedo died of gunshot wounds to his face and the back of his neck; that Marquez died of gunshot wounds to the back of his head, the back of his shoulder, his right back, his right hip, his left thigh, and his right arm; and that Gomez died of gunshot wounds to the back of his head, his right arm, his right chest, and his right wrist.
Officer David Rockett of the Birmingham Police Department testified that he assisted in executing a search warrant at Billups’s residence at 5918 Old Springville Road on January 15, 2004. In the kitchen area, they found what appeared to be a bullet hole in the floor, an area where some of the linoleum flooring had been torn up, and an empty shell casing.
Carl Mauterer, a forensic biologist with the Alabama Department of Forensic Sciences, testified that, on January 14, 2004, he went to Billups’s residence at 5918 Old Springville Road to search for blood evidence using luminol. While he was there, he observed evidence of blood on a wall, the floor, a chair, and a mop in the kitchen. There was also evidence of blood on some stairs, the floor, a pillow at the bottom of a stairwell from the kitchen to the basement, and a heater that was in the basement. Mauterer testified that DNA testing confirmed that the blood on the wall, heater, and floor matched the victim’s blood.
Mitch Rector, a firearms and toolmarks examiner with the Birmingham Police Department, testified that five of the bullets that were recovered from the victim were fired from the same gun. He also testified that one of the bullets that was recovered from the case involving the killings of the four Hispanic men could not be positively identified as having been fired from the same gun, but it also could not be excluded.
William E. Moran, the firearms and tool-marks discipline chief for the Alabama Department of Forensic Sciences, testified that he examined the shell casing from Billups’s kitchen, a shell casing from Valla-dres’s apartment, and a Taurus 9 mm handgun a diver found in a lake and determined that both shell casings had been fired from that gun. He also testified that another bullet from the case involving the four Hispanic men had similarities to the bullets that were fired from the Taurus, but did not have enough microscopic detail *1042 for him to make a positive identification. Moran further testified that the remaining eleven shell casings from Valladres’s apartment matched each other and had been fired from the same gun.
Charles Cooper testified that, on December 13, 2003, he went to Billups’s house on Old Springville Road and saw Courthers on her hands and knees wiping blood off of the kitchen floor. He also testified that he asked Billups what happened, and Billups told him he had to kill the victim, whom he referred to as “T,” the night before. Cooper testified that Billups had blood on his hands and that Billups threw him two bags of marijuana he had gotten from the victim.
Cooper testified that, at another time, he, Billups, and Parrish were talking about what occurred with the victim. At that time, Billups said that he did not like the victim and had to kill him, that the victim was focused on watching Parrish and another person, and that he snuck up behind the victim and shot him in the head. Bill-ups also told him that he took eight pounds of marijuana, 4½ ounces of cocaine, and a gun from the victim.
Cooper testified that he had met the victim once before after he bought some cocaine from Billups that was not right because it had had something mixed in it. He stated that he met with the victim and tried to straighten out the drugs. Afterward, he recommended that the victim get his money back, and he stated that the victim did get his money back from Bill-ups.
Cooper also testified that, on December 16, 2003, he, Billups, Parrish, and Courth-ers were at Billups’s house when Valladres and Stuart arrived. At that time, all four of them drew guns on the two men, duct taped their hands, and had them telephone other people to deliver marijuana to Valla-dres’s apartment. They then took Valla-dres and Stuart to Valladres’s apartment and waited for the people to bring the marijuana.
Cooper testified that four Hispanic men arrived at Valladres’s apartment with marijuana and that an argument ensued. He also testified that, at the spur of the moment, Billups started shooting the men. Cooper testified that he thought that Bill-ups shot the first two men once in the head and that Billups shot the other two more times because they tried to run. Valladres and Stuart escaped. Cooper testified that they took the marijuana with them after the shootings and that it was later divided. He explained that they intended to rob the four men, that he did not know Billups was going to shoot them, and that he entered a plea of guilty to felony-murder based on his participation in the incident.
The defense extensively cross-examined Cooper and specifically pointed out inconsistencies between his trial testimony and a prior statement to Detective Young. Afterward, Deputy United States Marshal Russell Tithof testified that he apprehended Cooper and spoke to him about the offenses on January 14, 2004. With regard to this case, he testified that Cooper said he had gone to Billups’s house, that he had seen blood on the floor and what he thought were bullet holes in the kitchen, that Billups had told him he had killed the victim, and that Billups had given him marijuana.
With regard to the killings of the four Hispanic men, Tithof testified that Cooper told him that Billups owed the men $5,000, that the men were going to give Billups $30,000 worth of marijuana in exchange for $15,000 in cash, and that the men were going to front him and Billups $15,000 worth of marijuana. Cooper also told him that he was not there when the Hispanic *1043 men arrived with the marijuana; that he had been there earlier but had left when no one had arrived; and that, later that night, Billups came to his apartment with blood all over his pants and said, “ ‘[W]e did the _ Mexicans.’ ” (R. 848.)
Billups testified on his own behalf and stated that numerous people were in and out of his house and that he did not know that someone had been killed there. He also stated that he had four or five cellular telephones and that he let other people use them. Billups testified that the victim was a good friend of his and that he did not kill him. He also testified that he was on the run in Iowa because of the case involving the four Hispanic men when he learned about the victim’s murder. Finally, he stated that he had been convicted in the case involving the four Hispanic men and sentenced to death row and that his convictions were pending on appeal.
I.
Billups’s first argument is that the trial court erred in admitting evidence about the killings of the four Hispanic men, in violation of Rule 404(b), Ala. R. Evid. He also appears to argue that the evidence about the collateral act was unduly prejudicial.
We extensively discussed similar facts and arguments in Irvin v. State, 940 So.2d 331, 344-52 (Ala.Crim.App.2005), as follows:
“Irvin argues that the circuit court erred when it allowed Norman Williams to testify about Irvin’s involvement in the September 1999 robbery and murder of Dacqurie Lane. Specifically, he contends that this evidence was not probative of any issue at trial, was offered solely to establish his bad character, did not fall within an exception to the exclusionary rule, and because the probative value of the evidence was outweighed by its potential prejudicial effect.
“ ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). Moreover, ‘ “[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.”’ Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).
“Rule 404(b), Ala. R. Evid., provides:
“ ‘Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.’
“Before the effective date of Rule 404(b) — January 1, 1996 — the exclusionary rule was explained and followed by the Alabama courts. The adoption of Rule 404(b) did not abrogate prior case- *1044 law on this topic. Hunter v. State, 802 So.2d 265 (Ala.Crim.App.2000), cert. denied, 802 So.2d 273 (Ala.2001). We note moreover, that the Alabama Supreme Court’s decision in Ex parte Casey, 889 So.2d 615 (Ala.2004), while tightening the use of Rule 404(b) evidence, did not prohibit the use of such evidence. Moreover, given the particular facts of this case, we conclude that the holding in Ex parte Casey does not prohibit the admission of Norman Williams’s testimony in this case.
“In Robinson v. State, 528 So.2d 343 (Ala.Crim.App.1986), this Court discussed the purpose of the exclusionary rule, stating:
“ ‘ “ ‘On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.’ ” Pope v. State, 365 So.2d 369, 371 (Ala. Cr.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01 (3d ed.1977). “ ‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy’s supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant’s right to a fair trial. “‘The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
“ ‘ “If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.” Saffold v. State, 494 So.2d 164 (Ala.Cr.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App.1984); Scott v. State, 353 So.2d 36 (Ala.Cr.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be *1045 reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value -will be held to outweigh its potential prejudicial effects.’ ” Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra at 468-69. “ ‘ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [Citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.” ’ ” Averette v. State, supra, at 1374.’
“528 So.2d at 347. See also Hocker v. State, 840 So.2d 197, 213-14 (Ala.Crim.App.2002).
“Finally, both this Court and the Supreme Court have recognized that collateral-act evidence — sometimes referred to as ‘prior bad-act evidence’ — need not have occurred before the now-charged crime in order to be admissible as collateral-act evidence. See, e.g., Anonymous v. State, 507 So.2d 972, 974 n. 1 (Ala.1987); Cothren v. State, 705 So.2d 849, 858-60 (Ala.Crim.App.), aff'd, 705 So.2d 861 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998) (upholding admission of collateral-act evidence regarding appellant’s participation in a robbery-homicide occurring after the crime for which he was being tried under the common plan or scheme exception); Hinton v. State, 632 So.2d 1345, 1347-48 (Ala.Crim.App.1993) (upholding admission of subsequent collateral offense to prove intent); Hayes v. State, 384 So.2d 623, 626 (Ala.Crim.App.1979) (upholding admission of subsequent collateral act to prove intent and identity).
“The collateral-act evidence concerning the robbery and murder of Daequrie Lane was admissible under the identity exception to the general exclusionary rule. See Wimberly v. State, 934 So.2d 411 (Ala.Crim.App.2005).
“Collateral-act evidence is admissible to prove identity only when the identity of the person who committed the charged offense is in issue and the charged offense is committed in a novel or peculiar manner. 1 Charles W. Gamble, McElroy’s Alabama Evidence § 69.01(8) (5th ed.1996); Ex parte Arthur, 472 So.2d 665 (Ala.1985); Johnson v. State, 820 So.2d 842, 861 (Ala.Crim.App.2000); Tyson v. State, 784 So.2d 328, 344 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000). ‘Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are “signature crimes” having the accused’s mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person.’ Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim.App.1983). ‘[E]vi-dence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime “exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.” ’ Ex parte Arthur, 472 So.2d at 668 (quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). See also Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); and Govan v. State, 40 Ala.App. 482, 115 *1046 So.2d 667 (1959) (recognizing that the identity exception is applicable only where both the prior crime and the charged offense were committed in the same special or peculiar manner).
“When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. In other words, the physical similarity must be such that it marks the offenses as the handiwork of the accused. Thus, as Dean Charles Gamble points out, a greater degree of similarity between the charged offense and the collateral act is required for admissibility to prove identity than for admissibility to prove intent or knowledge. However, Dean Gamble goes on to note that ‘[e]ven if identity is not material at the outset of the case, ... it may be made material by conduct of the defense such as cross-examining the identifying witness in such a way as to indicate mistake, by positions taken, or in argument of counsel.’ McElroy’s Alabama Evidence, supra at § 69.01(8).
“In Howell v. State, 627 So.2d 1134, 1140 (Ala.Crim.App.1993), this Court upheld the admission of collateral-act evidence to establish identity, stating that ‘the defendant’s identity was placed into issue when he pleaded not guilty to the burglary charge and when the State was unable to positively identify the defendant as the perpetrator.’ Irvin argues that because he did not place his identity as the perpetrator at issue, the State was prohibited from offering collateral-act evidence to establish his identity. A careful review of the record, however, indicates otherwise. In the statement Irvin gave to ABI Agent Anthony Frost, Irvin did not say that he shot Jackie Thompson; instead, Irvin stated that Al-ister Butler was the person who shot Thompson. Thus, with Butler and Irvin each attempting to portray himself as the passive observer — e.g., an ‘innocent bystander’ — lacking the intent to rob and murder Jackie Thompson, law-enforcement officials were left with the dilemma of determining the identity of the perpetrator, as well as intent and motive. However, because Irvin was the only individual involved in both the robbery and murder of Jackie Thompson and the robbery and murder of Dac-qurie Lane, the testimony of Norman Williams was necessary to establish the identity of the person who robbed and murdered Jackie Thompson.
“Moreover, evidence of the robbery and murder of Dacqurie Lane was admissible under the identity exception to the general exclusionary rule because he was killed in the same unique manner as Jackie Thompson. Thompson, who was 19 years old at the time of his death, was the boyfriend of Lawanda Fallin— Irvin’s sister. Therefore, Irvin was well-acquainted with Thompson. Moreover, Irvin was present at the party Thompson attended before his disappearance on the night of November 12, 1997.
“On November 13, 1997, Walter Vail discovered a burned vehicle later determined to belong to Thompson on his farm in south Macon County. Almost two years later, Thompson’s remains were located in an isolated area in Macon County, approximately 26.4 miles from where his burned vehicle had been discovered. Forensic analysis of the remains indicated that Thompson had suffered serious injuries to his skull that were consistent with a gunshot to the head. Irvin told law-enforcement officials that he and Alister Butler had killed Thompson by shooting him in the head during the course of a robbery. Irvin stated that they took money from Thompson’s person and then drove his *1047 car to a remote location and set it on fire. The two then took Thompson’s body to another isolated area and dumped it.
“The robbery and murder of Dacqurie Lane followed a similar pattern. Norman Williams testified that he, Irvin, and Lane were acquaintances. Lane was 21 years old at the time of his death. Williams testified that on September 1, 1999, he and Irvin encountered Lane on the campus of Tuskegee University. In response to the pair’s request, Lane agreed to drive Irvin and Williams to where Williams’s truck was parked. Once inside Lane’s vehicle— also a truck — Irvin directed Lane to drive to a remote area of Macon County. After Lane stopped the truck, Irvin directed him to get out of the vehicle, empty his pockets, and then get on his knees. When Lane refused, Williams stated that Irvin shot him in the head. Irvin and Williams left Lane’s body in the field, and they took his truck and drove to Atlanta. The pair stayed in Atlanta for two days, before returning to Tuskegee. Upon their return to Tuskegee, Irvin and Williams took Lane’s truck to a remote area approximately 8-10 miles from where they had left Lane’s body and set fire to the vehicle.
“As can be seen, numerous similarities exist in these two incidents. In both instances, the victims were young men; Thompson was 19; Lane was 21. Both were acquainted with Irvin. Both crimes were committed at night and in Macon County. Both victims were killed in a remote area. In both cases, Irvin had an accomplice and killed the victim during the course of a robbery. In both cases, the victim’s body was dumped in an isolated area of Macon County. Finally, in both cases the victim’s vehicle was taken to a different isolated area in Macon County and set on fire.
“Given the parallel circumstances surrounding the robbery and murder of Thompson and the robbery and murder of Lane, we conclude that the two crimes were committed ‘in the same novel and peculiar manner.’ Accordingly, the collateral-act evidence of Lane’s robbery and murder was admissible under the identity exception to the general exclusionary rule.
“Evidence of Irvin’s participation in the robbery and murder of Dacqurie Lane was likewise admissible under the intent exception to the general exclusionary rule.
“Addressing the admissibility of collateral-act evidence pursuant to the intent exception, Dean Charles Gamble has written:
“ ‘If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court.’
“McElroy’s Alabama Evidence § 69.01(5) (footnotes omitted).
“Irvin was charged with murder committed during the course of a robbery. Thus, robbery was a material element of this offense. However, because Irvin contended that the State had failed to *1048 prove that he intended to rob Thompson, the collateral-act evidence concerning Irvin’s involvement in the robbery and murder of Daequrie Lane was admissible pursuant to the intent exception to the general exclusionary rule. See Presley v. State, 770 So.2d 104, 110 (Ala. Crim.App.1999), aff'd, 770 So.2d 114 (Ala.), cert. denied, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000) (upholding admission of collateral-act evidence to show intent and motive when defendant argued that because he did not intend to rob the victim he could not be convicted of capital murder). Given the similarity of the facts surrounding the robbery and murder of Jackie Thompson and the robbery and murder of Daequrie Lane, the circuit court did not err in allowing evidence relating to Daequrie Lane’s robbery and murder to be admitted into evidence under the intent exception to the general exclusionary rule.
“We note that although Irvin argues to this Court that this collateral-act evidence should not have been admitted because he did not deny that he committed the robbery, an examination of the record indicates otherwise. Admittedly, Irvin did not take the stand and deny that he intended to rob Jackie Thompson; however, his defense counsel based their motion for a judgment of acquittal concerning the capital offense of robbery-homicide on the fact that the State had failed to prove Irvin intended to rob the victim. Defense counsel reiterated this claim during the penalty-phase opening argument. Additionally, counsel at one point argued that it was Irvin’s codefendant Alister Butler who robbed and murdered the victim, and that Irvin had no knowledge of Butler’s plan. Evidence concerning Daequrie Lane’s robbery and murder was highly probative as to whether Irvin intended to rob Thompson when he murdered him.
“Moreover, as we set out above in some detail, the facts surrounding the robberies and murders of both Thompson and Lane were quite similar. In each instance, Irvin, assisted by an accomplice, encountered the victim at night. They went to an isolated area of Macon County to rob him. The victim, in each instance a young man, was outnumbered by his robbers. During the course of the robbery, Irvin killed the victim by shooting him in the head. In each case, Irvin and his accomplice took care to avoid leaving a crime scene for someone to stumble across, disposing of the victim’s body and his vehicle in separate locations, and then burning the vehicle to destroy any incriminating evidence that might be left behind in the vehicle. Given these circumstances, the trial court did not err in admitting the collateral-act evidence.
“Finally, Norman Williams’s testimony concerning Irvin’s participation in the robbery and murder of Daequrie Lane was admissible under the motive exception to the general exclusionary rule.
“Evidence tending to establish motive is always admissible. Perkins v. State, 808 So.2d 1041, 1084 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also McElroy’s Alabama Evidence § 70.01(12)(e). In discussing motive, the Alabama Supreme Court has stated:
“ ‘ “Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged.” Spicer v. State, 188 Ala. 9, 26, 65 So. 972, 977 (1914). Motive is “that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’ ” *1049 C. Gamble, Character Evidence, [A Comprehensive Approach (1987) ] at 42. “Furthermore, testimony offered for the purpose of showing motive is always admissible. It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.” (Emphasis in original, citations omitted.) Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988).’
“Ex parte Register, 680 So.2d 225, 227 (Ala.1994). ‘If the prior bad act falls within [the motive] exception, and is relevant and reasonably necessary to the State’s case, and the evidence that the accused committed that act is clear and conclusive, it is admissible.’ Boyd v. State, 715 So.2d 825, 838 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
“Irvin was charged with murder committed during the course of a robbery. Thus, robbery was a material element of this offense. However, because Irvin contended that the State had failed to prove that he intended to rob Thompson, the collateral-act evidence concerning Irvin’s involvement in the robbery and murder of Dacqurie Lane was admissible pursuant to the motive exception to the general exclusionary rule. See McClendon v. State, 813 So.2d 936, 944 (Ala.Crim.App.200[1]) (upholding admission of accused’s collateral act of soliciting someone to murder his first wife as relevant to prove intent and motive in prosecution for soliciting murder of accused’s second wife); Presley v. State, 770 So.2d 104, 110 (Ala.Crim.App.1999), aff'd, 770 So.2d 114 (Ala.), cert. denied, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000) (upholding admission of collateral-act evidence of other robberies to show intent and motive when defendant argued that because he did not intend to rob the victim he could not be convicted of capital murder). As discussed in detail above, given the similarity of the facts surrounding the robbery and murder of Jackie Thompson and those surrounding the robbery and murder of Dacqurie Lane, the circuit court did not err in allowing evidence of Dacqurie Lane’s robbery and murder to be admitted into evidence under the motive exception to the general exclusionary rule.
“Irvin also argues that the probative value of the evidence of his collateral bad act was substantially outweighed by the danger of unfair prejudice.
“Relevant evidence is evidence that has ‘any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.’ Rule 401, Ala. R. Evid. ‘All relevant evidence is admissible, except as otherwise provided.’ Rule 402, Ala. R. Evid. Rule 403, Ala. R. Evid., provides:
“ ‘Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.’
“In Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997), this Court stated:
“ ‘The power to make this determination is vested in the trial court. Zielke v. AmSouth Bank, 703 So.2d 354, 361 (Ala.Civ.App.1996); see also C. Gamble, Gamble’s Alabama Rules of Evidence § 403. We will not disturb such a determination unless it is clearly an abuse of discretion.’
*1050 “Evidence of Irvin’s collateral bad act does not fit neatly into a single recognized exception. Rather, it spills over into three of the recognized exceptions. Nevertheless, that evidence may be admissible if such evidence is relevant to the issues presented and if its probative value outweighs any prejudicial effect that that evidence might have. In Nicks v. State, 521 So.2d 1018, 1025-26 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this Court wrote:
“ ‘Alabama law provides for the admissibility of evidence of collateral crimes or acts as part of the prosecution’s case-in-chief if the defendant’s collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, [440 So.2d 1155 (Ala.Crim.App.1983) ]. Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted.... All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 488, 66 So.2d 557 (1958); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
“ ‘ “All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.’
“ ‘Underhill, Criminal Evidence § 154 (3d ed.1923). If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State’s case-in-chief rests in the sound discretion of the trial judge. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976); McDonald v. State, 57 Ala.App. 529, 329 So.2d 583 (1975), writ quashed, 295 Ala. 410, 329 So.2d 596 (1976), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976).’
“As previously stated, probative evidence of collateral bad acts may be excluded only when it is ‘unduly and unfairly prejudicial.’ Here, evidence about Irvin’s collateral bad act was relevant, was not admitted simply to prove Irvin’s bad character, and was more probative on the issue of guilt than it was prejudicial to his defense. Accordingly, the court did not abuse its discretion in admitting this evidence.”
The Alabama Supreme Court recently reiterated the principles set forth in Irvin *1051 and Robinson governing the admissibility of collateral bad act evidence in Ex parte Jackson, 33 So.3d 1279 (Ala.2009). It also emphasized that, even if evidence about a collateral bad act falls -within one of the exceptions to Rule 404(b), Ala. R. Evid., the State must still demonstrate that the evidence is reasonably necessary to its case.
In this case, when it determined that the evidence about the killings of the four Hispanic men was admissible, the trial court stated:
“I think it is just based upon the close proximity, the fact that the same weapon was used, and the fact that they are very similar. I think both the victim in this case and the victims in the other case were shot in the back of the head.
“... I’m saying the act is admissible under 404(b), similar evidence tending to show that just the close facts of the case, how they are so — the offenses are so similar to each other, so close in time, same weapon used.”
(R. 11-12.) The dissent states that “the trial court appeared to admit the evidence based solely on its determination that the crimes were similar.” 86 So.3d at 1073. It also questions the purpose or purposes for which the State sought to admit the evidence. However, Billups was tried for the killings of the four Hispanic men before he was tried for the killing of Lockett, the same judge presided over both trials, and much of the same evidence was admitted in both trials. Thus, the trial court was already quite familiar with the collateral bad act evidence the State sought to admit, and it obviously did not believe that extensive discussions in that regard were necessary for it to rule on the admissibility of the evidence. In that regard, the trial court specifically stated, “I think I ruled in the earlier case that ... that this case was admissible in that one. I tend to think it would go the other way as well.” (R. 10-11.)
We agree with the trial court’s conclusion regarding the admissibility of the evidence about the killings of the four Hispanic men. There were several similarities between the two offenses. In both cases, the victims were young and were involved with drugs. Also, in both cases, Billups telephoned the victims and lured them to a location of his choosing with the offer of making a drug deal, shot the victims in the head after they arrived at the designated locations, and then took the victims’ property. Finally, the offenses occurred within a period of three days; each occurred partially or completely at Billups’s house; and there was evidence that the same gun was used at both crime scenes.
In light of the similarities between the two offenses, we conclude that the two crimes were committed “in the same novel and peculiar manner” and that the evidence about the killings of the four Hispanic men was admissible under the identity and plan or pattern exceptions to the general exclusionary rule. Further, because both offenses involved killings that facilitated robberies for drugs and/or money, we conclude that evidence about the killings of the four Hispanic males was also admissible under the intent and motive exceptions to the general exclusionary rule.
In attempting to distinguish the two cases, the dissent States that “[t]he four Hispanic men were not lured to Billups’s residence.” 86 So.3d at 1075. However, as we noted above, the evidence showed that Billups lured the victims in both cases to a location of his choosing with the offer of making a drug deal. The dissent also notes that “[t]he bodies were left in the apartment[, and] the killer or killers did *1052 nothing to attempt to conceal the murders.” 86 So.3d at 1075. However, because the killings of the four Hispanic men occurred at a location other than Billups’s house, the need to conceal the murders was not as great as it was in the case involving the murder of Lockett. Finally, the dissent discounts evidence that all of the victims were shot in the head because some of them also sustained gunshot wounds to other parts of their bodies. However, Cooper testified that he thought that Billups shot the first two Hispanic men once in the head and that he shot the other two more times because they tried to run. It is therefore reasonable to conclude that they may have sustained gunshot wounds to other parts of their bodies because they tried to run. Thus, the evidence refutes the dissent’s assertion that “[tjhese crimes were not both committed in such a novel or peculiar way as to make evidence regarding the quadruple murder admissible under the identity or common plan, scheme, or design exceptions to the exclusionary rule.” 86 So.3d at 1076.
We must next determine whether the probative value of the collateral bad acts evidence is substantially outweighed by its prejudicial effects. In this case, throughout the trial, Billups attempted to cast blame on Cooper. The evidence about the killings of the four Hispanic men had an extremely high probative value in light of the fact that Billups attempted to blame Cooper and contended that he did not kill the victim or know that anyone had been killed in his house. The evidence connected him to both crime scenes and also showed the motive, intent, and plan by which he lured people to specified locations for drug deals, killed them, and stole from them. Because evidence from the crime scene involving the four Hispanic males tied Billups to evidence found at the crime scene in this case, the evidence about the killings of the four Hispanic males was reasonably necessary to the State’s case and was plain, clear, and conclusive. Contrast Ex parte Jackson, 33 So.3d 1279 (Ala.2009) (holding that the State did not demonstrate that evidence about a separate capital murder conviction was reasonably necessary to its case). Although the evidence was obviously prejudicial, it was not unduly and unfairly prejudicial. Finally, the trial court repeatedly instructed the jury, both during the trial and during its oral charge, as to the proper use of evidence about collateral acts. See Snyder v. State, 893 So.2d 482, 486-87 (Ala.2001). Therefore, under these circumstances, the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.
The dissent argues that “[tjhe State’s evidence against Billups in the Lockett shooting was substantial” and that there was not any real doubt as to Billups’s identity, motive, or intent. 86 So.3d at 1076-77. It then concludes that “[ejvi-dence of the quadruple murder was, therefore, not reasonably necessary to the State’s case to establish any of the those issues.” 86 So.3d at 1077. Cooper testified for the State and provided detailed testimony, including Billups’s admissions, about the murder of the victim. However, he was a convicted felon, and Billups attempted to cast blame on Cooper at every turn. Therefore, Billups’s identity as the murderer was certainly in question. Also, the defense extensively cross-examined Cooper and specifically pointed out inconsistencies between his trial testimony and a prior statement to Detective Young.
We are aware of the Alabama Supreme Court’s decision in Ex parte Jackson, 33 So.3d 1279 (Ala.2009), and its holding regarding the admission of collateral bad act evidence. However, unlike in Jackson, for the reasons set forth above, *1053 the evidence about the killings of the four Hispanic males was relevant to establish Billups’s identity, intent, pattern or plan, and motive; was not admitted simply to prove Billups’s bad character; and was more probative than it was prejudicial to his defense because it was reasonably necessary to the State’s case and was plain, clear, and conclusive. For these reasons, we conclude that this case is distinguishable from Jackson. Accordingly, the trial court did not abuse its discretion in admitting the evidence.[1]
Billups appears to argue that the trial court’s limiting instructions were not sufficient. (Issue XI in Billups’s brief.) The trial court asked the parties for input or suggestions regarding the limiting instructions. However, Billups did not object to the trial court’s instructions. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
During the trial and during its instructions to the jury, the trial court repeatedly instructed the jury as to the limited purpose for which evidence about the killings of the four Hispanic men was being admitted. It also specifically instructed the jury that it could not use the collateral bad act evidence to show Billups’s bad character or to show that he acted in conformity therewith. The defense did not object to the trial court’s instructions, and it did not accept the trial court’s invitation to provide input regarding the limiting instructions to be given. Finally, we note that such evidence was not offered as impeachment evidence, but rather was properly admissible for other purposes. See Johnson v. State, [Ms. 1041313, October 6, 2006] — So.3d - (Ala.2006). Therefore, the dissent’s objections notwithstanding, we do not find that there was any error, plain or otherwise, in this regard.
II.
Billups’s second argument is that Alabama’s death penalty scheme is unconstitutional because the jury does not make all of the findings of fact that are necessary to support the imposition of the death penalty. We addressed and rejected a similar argument in Barber v. State, 952 So.2d 393, 458-59 (Ala.Crim.App.2005), as follows:
“First, the appellant contends that the scheme is unconstitutional because the jury does not make all of the findings of fact that are necessary to support the imposition of the death penalty. With regard to his case, he specifically asserts that the trial court, rather than the jury, made findings of fact as to which aggravating and mitigating circumstances existed; that the trial court, rather than the jury, determined that the aggravating circumstances outweighed the mitigating circumstances; that the jury did not agree unanimously on the existence of the two aggravating circumstances; and that the jury did not unanimously find that the aggravating circumstances *1054 outweighed the mitigating circumstances.
“In Ex parte Waldrop, 859 So.2d 1181, 1187-88 (Ala.2002), the Alabama Supreme Court explained:
“ ‘It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A-5-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala.Code 1975, § 13A-5-45(f) (“Unless at least one aggravating circumstance as defined in Section 13A-5^49 exists, the sentence shall be life imprisonment without parole.”); Johnson v. State, 823 So.2d 1, 52 (Ala.Crim.App.2001) (holding that in order to sentence a capital defendant to death, the senteneer “ ‘must determine the existence of at least one of the aggravating circumstances listed in [Ala. Code 1975,] § 13A-5-49’ ” (quoting Ex parte Woodard, 631 So.2d 1065, 1070 (Ala.Crim.App.1993))). Many capital offenses listed in Ala. Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:
“ ‘ “For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder during a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5^40(a)(l), parallel the aggravating circumstance that ‘[t]he capital offense was committed while the defendant was engaged ... [in a] rape, robbery, burglary or kidnapping,’ § 13A-5-49(4).”
“ ‘Ex parte Woodard, 631 So.2d at 1070-71 (alterations and omission in original).
“‘Furthermore, when a defendant is found guilty of a capital offense, “any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.” Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (“The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.”). This is known as “double-counting” or “overlap,” and Alabama courts “have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.” Ex parte Trawiclc, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).
“‘Because the jury convicted Wal-drop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was “proven beyond a reasonable doubt.” Ala.Code 1975, § 13A-5 — 45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop’s case, the jury, and not the trial judge, *1055 determined the existence of the “aggravating circumstance necessary for imposition of the death penalty.” Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require.’
“(Footnote omitted.)”
In this case, because the jury convicted Billups of the capital offense of robbery-murder, that aggravating circumstance was proven beyond a reasonable doubt. Therefore, the jury, and not the judge, determined the existence of the “aggravating circumstance necessary for imposition of the death penalty.” Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 2443 (2002). Also, because the jury found the existence of one aggravating circumstance, Billups was exposed to or eligible for the death penalty, and “[t]he trial court’s subsequent determination that the murder [was] especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances.” Waldrop, 859 So.2d at 1190. Accordingly, there was not a Ring violation in this case, and Billups’s arguments to the contrary are without merit.
III.
Billups’s third argument is that the trial court should have granted him funds to hire a private psychologist and a mitigation expert.[2] The record shows that he filed motions to hire a psychologist, a mitigation expert, and an investigator. The trial court granted the motion for funds to hire an investigator. However, with regard to the motions for funds to hire a private psychologist and a mitigation expert, the trial court noted: “Denied. The Court has been informed that previous counsel for Kenneth Billups hired Dr. Kimberly Ackerson as a possible mitigation expert and psychologist, but Dr. Ackerson did not find any information that would have been beneficial to the Defendant.” (C.R. 23.) Also, during a hearing on the motions, after explaining its understanding of Ackerson’s findings from Billups’s previous case, the trial court instructed defense counsel to talk to Bill-ups’s previous counsel and Ackerson, to find out what information they had, and to file updated motions afterward if necessary. Defense counsel did not file any subsequent motions requesting funds to hire a mitigation expert and/or a psychologist. Aso, just before the trial started and again just before the penalty phase started, defense counsel specifically advised the trial court that Ackerson had performed a mental evaluation of Billups for the previous trial and stated that she really could not provide anything that would be beneficial to him in this case. Under these circumstances, we do not find that the trial court committed any error in this regard.
IV.
Billups’s fourth argument is that the trial court erred in denying his motion for discovery of a transcript, exhibits, and me-morialization of the grand jury proceedings and a list of the grand jury members. We addressed a similar request for grand jury information in Blackmon v. State, 7 So.3d 397, 408-10 (Ala.Crim.App.2005), as follows:
*1056 “Blackmon argues that the circuit court erred in denying her motion requesting discovery of the transcript of the grand-jury proceedings. Specifically, she argues that, because she was indicted for capital murder, she had a ‘special’ need to review the grand-jury proceedings.
“Blackmon was indicted for capital murder in August 1999. In March 2001, Blackmon moved that she be allowed discovery of the transcript, exhibits, and any other memorialization of the grand jury proceedings. The motion listed only one ground in support of the discovery of this evidence — that Blackmon had been indicted for capital murder.
“Alabama has long protected the secrecy of grand-jury proceedings. See § 12-16-214, Ala. Code 1975. ‘The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret.’ Steward v. State, 55 Ala.App. 238, 240, 314 So.2d 313, 315 (Ala.Crim.App.1975). However, a defendant may be allowed to inspect grand-jury proceedings if the defendant meets the threshold test of showing a ‘particularized need’ for breaching the secrecy of those proceedings. As this Court stated in Millican v. State, 423 So.2d 268 (Ala.Crim.App.1982):
“ ‘Before a defendant is allowed to inspect a transcript of a State’s witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343 (1959),] and Pate [v. State, 415 So.2d 1140 (Ala.1981) ], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness’ grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant’s testimony. In this case no such showing was made and the existence of any inconsistency between the witness’ trial and grand jury testimony was never even alleged. Cooks [v. State, 50 Ala.App. 49, 276 So.2d 634 (Ala.Crim.App.1973) ]. Also, there was no showing that the witness’ grand jury testimony, if available, was “of such nature that without it the defendant’s trial would be fundamentally unfair.” Cooks, 50 Ala. App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321 (1924). (“Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.”)
“ ‘In laying the proper predicate for examination of a witness’ grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
“ ‘ “When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.” Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437 [(1966)], cert. *1057 dismissed, 280 Ala. 718, 197 So.2d 447 (196[7]).
“ ‘Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury “differed in any respects from statements made to the jury during trial,” Pate, supra, and (2) whether the grand jury testimony requested by the defendant “was of such a nature that without it the defendant’s trial would be fundamentally unfair.” Pate, supra. This procedure will best preserve and protect the leg-' islative determination that “it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings, remain inviolate.” Alabama Code 1975, Sections 12-16-214 through 226.’
“423 So.2d at 270-71.
“Nonetheless, Alabama has no statute that requires that grand-jury proceedings be recorded or otherwise memorialized. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), the defendant argued that the circuit court erred in denying her motion to transcribe the grand-jury testimony. In upholding the circuit court’s ruling, we stated:
“ ‘ “In Alabama there is no statute requiring that testimony before a grand jury be recorded. ‘A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 [ (Ala.Crim.App.1974) ]. There is no such statute in this state.’ Sommerville v. State, 361 So.2d 386, 388 (Ala.Cr.App.), cert. denied, 361 So.2d 389 (Ala.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit.” ’
“Stallworth, 868 So.2d at 1139, quoting Hardy v. State, 804 So.2d 247, 287 (Ala. Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000). See also Steward v. State, supra.
“At the pretrial hearing on this motion, the prosecutor stated that it was the policy of the district attorney’s office to not record the grand-jury proceedings and that he had no knowledge that the grand-jury proceedings had been recorded in this case. Neither did Black-mon show a ‘particularized need’ to breach the secrecy of the grand-jury proceedings. Based on the cases cited above, we conclude that the circuit court committed no error in denying this motion made after Blackmon had been indicted. Cf. McKissack v. State, 926 So.2d 367 (Ala.2005) (request to preserve grand-jury proceedings was made before grand jury was empaneled).”
In his written motion for discovery with regard to the grand jury proceedings, Billups cited general principles of law and made a fleeting reference to the possibility of impeaching witnesses. During the hearing on the motion, the following occurred:
“THE COURT: Next is motion for order permitting discovery of transcripts, exhibits, and other memorialization of the grand jury proceedings, and a *1058 list of grand jury members. [Defense counsel], anything that you need to add to this?
“[DEFENSE COUNSEL]: Judge, other than the fact that the evidence is so slim, we’d like to know how they got an indictment. And I understand that grand jury proceedings normally are closed. But in this case, it is capital murder. We’d like the Court to consider giving us that.
“THE COURT: Well, I don’t think there’s any case law that I know of that says that should be given just because the defense thinks the case may be weak or not weak. I know that in his other case, I did order that the district attorney’s office give me a copy of the grand jury testimony for impeachment purposes, which I did. And I’ll do that. That’s covered in here, I think, as well in your motion.
“[DEFENSE COUNSEL]: Yes, sir.
“THE COURT: So to the extent that it requests that you get it for impeachment purposes, I’ll deny it. But I’ll review the grand jury testimony myself. And if there’s something I think is appropriate for impeachment purposes, I will give that to you, but it’s otherwise denied.”
(R. 28-29.) Finally, the trial court also entered the following order with regard to the motion:
“Granted to the extent that the District Attorney’s Office shall provide the Court with a copy of the Grand Jury testimony of witnesses in this case (by 3/17/06). The Court will review said testimony in camera and notify defense counsel if said testimony includes any exculpatory evidence, including notification regarding impeachment material after a witness has testified. Otherwise, the motion is denied.”
(C.R. 24.)
In this case, Billups made bare allegations and cited general principles of law, but did not show a particularized need to breach the secrecy of the grand jury proceedings. Also, the trial court specifically stated that it would review the grand jury testimony and notify defense counsel as to the existence of any exculpatory evidence, including impeachment material.[3] Under these circumstances, the trial court did not err in denying Billups’s motion for discovery with respect to the grand jury proceedings.
V.
Billups’s fifth argument is that the trial court erred in denying his motion in limine as to allegedly prejudicial photographs.
“ ‘ “Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” ’
*1059 “Gaddy v. State, 698 So.2d 1100, 1148 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989)). Furthermore, photographs that depict the crime scene are relevant and therefore admissible. Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Finally, photographs may be admissible even if they are cumulative or demonstrate undisputed facts. Stanton v. State, 648 So.2d 638 (Ala.Cr.App.1994); Hopkins v. State, 429 So.2d 1146, 1157 (Ala.Cr.App.1983).”
Hyde v. State, 778 So.2d 199, 234-35 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
“ ‘[Pjhotographs depicting the character and location of wounds on a deceased’s body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986) ]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.’
“Ex parte Bankhead, 585 So.2d 112 (Ala.1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, [497] U.S. [1032], 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy’s at § 207.01(2).”
Parker v. State, 587 So.2d 1072, 1092-93 (Ala.Crim.App.1991), opinion extended after remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala.1992). Finally,
“ ‘ “[p]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy’s Alabama Evidence, § 207.01(2) (4th ed.1991). “The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome....” Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).’
“DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim’s body to be received into evidence.”
Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Crim.App.1994), rev’d on other grounds, 677 So.2d 1205 (Ala.1996). See also Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992).
In this case, the trial court thoroughly reviewed the photographic evidence before it was admitted at trial. Likewise, we have reviewed the photographic evidence, and we find that it was neither unduly prejudicial nor inflammatory. Rather, the evidence was relevant to depict the nature and extent of the injuries the victims suffered and the crime scenes in both cases involving Billups, made it *1060 possible for the jury to view the injuries to the victims and both crime scenes, to aid in presenting testimony about the victim’s body and the crime scene in this case, and to show the similarities between the killings in the two cases. Therefore, the trial court did not err in admitting the photographic evidence.
VI.
Billups’s sixth argument is that the trial court erred in denying his motion to disqualify all potential jurors who knew or were acquainted with the victim or his family. We addressed a similar argument in Taylor v. State, 808 So.2d 1148, 1184-85 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), as follows:
“Taylor argues that the trial court erred when it denied his pretrial motion to disqualify ‘all potential jurors who were acquainted with either the victims or who know any of the victim’s immediate family members.’ Taylor argues that because these persons would have known the deceased’s standing and reputation in the community and because they would be tainted by the grief of family members, they should have been automatically disqualified.
“ ‘ “[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.” Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).... Instead, the test is “whether the [prospective] juror’s acquaintance with [the victim] or relative is such that it would result in probable prejudice.” Vaughn v. Griffith, 565 So.2d 75, 77 (Ala.1990), cert. denied, 498 U.S. 1097, 111 S.Ct. 987, 112 L.Ed.2d 1072 (1991).’
“Morrison v. State, 601 So.2d 165, 168 (Ala.Cr.App.1992) (citations omitted). Because a veniremember’s mere acquaintance with a victim or a family member of a victim is not sufficient to justify a strike for cause, the trial judge did not err when it denied Taylor’s motion. There is no error here.”
As we did in Taylor, we conclude that the trial court did not err in denying Billups’s motion in this case.
VII.
Billups’s seventh argument is that the State did not present sufficient evidence to support his conviction.
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala. Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the *1061 jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
“Tn determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’ Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Fairdoth, [471] So.2d 493 (Ala.1985).
[[Image here]]
“ ‘ “The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’ Granger [v. State], 473 So.2d [1137,] 1139 [ (Ala.Crim.App.1985) ].
“... ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
“ ‘[cjircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).’
“Ward [v. State], 610 So.2d [1190] at 1191-92 [ (Ala.Crim.App.1992) ].”
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997).
Section 13A-5-40(a)(2), Ala. Code 1975, provides that a murder committed “by [a] defendant during a robbery *1062 in the first degree or an attempt thereof committed by the defendant” constitutes capital murder.
“(a) A person commits the crime of robbery in the first degree if he violates Section 1 BA-8-43 and he:
“(1) Is armed with a deadly weapon or dangerous instrument; or
“(2) Causes serious physical injury to another.
“(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.”
§ 13A-8-41, Ala.Code 1975.
“(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
“(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
“(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.”
§ 13A-&43, Ala.Code 1975.
“To sustain a conviction under § 13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a ‘robbery in the first degree or an attempt thereof,’ as defined by § 13A-8-41; (2) a ‘murder,’ as defined by § 13A-6-2(a)(l); and (3) that the murder was committed ‘during’ the robbery or attempted robbery, i.e., that the murder was committed ‘in the course of or in connection with the commission of, or in immediate flight from the commission of the robbery or attempted robbery in the first degree, § 13A-5-39(2). Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
“ ‘As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), “the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.” Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position “would be tantamount to granting to would-be robbers a license to kill their victims *1063 prior to robbing them in the hope of avoiding prosecution under the capital felony statute.” Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
“ ‘Although a robbery committed as a “mere afterthought” and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra, O’Pry v. State, supra [642 S.W.2d 748 (Tex.Cr.App.1981) ], the question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim’s property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant’s intent to rob the victim can be inferred where “[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.” Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App.1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Clements v. State, 370 So.2d 708 (Ala.Cr. App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979).’
“Connolly, 500 So.2d at 63.”
Hallford v. State, 548 So.2d 526, 534-35 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).
“It is sometimes said that a robbery committed as a ‘mere afterthought’ and unrelated to the murder will not sustain a conviction for the capital offense of murder-robbery. Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). However, the appellant’s intent to rob the victim may lawfully and correctly be inferred where the killing and the robbery were part of a continuous chain of events. Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).”
Harris v. State, 671 So.2d 125, 126 (Ala.Crim.App.1995). Finally,
“ ‘[ijntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’ McCord v. State, 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908).”
French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), affd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
“ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’ Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985).”
Oryang v. State, 642 So.2d 989, 994 (Ala.Crim.App.1994).
In this case, the State presented evidence that Billups repeatedly telephoned the victim, that the victim finally went to his house, and that Billups shot the victim in the head. It also presented evidence that Billups took drugs and a gun from the victim. Cooper testified that he saw blood on Billups and drugs in Billups’s *1064 house the next day and that Billups admitted to Cooper that he had killed and robbed the victim. He also testified as to Billups’s role in the robbery and killings of four Hispanic men three days later. Finally, the State presented evidence that blood from Billups’s house matched the victim’s blood, that a shell casing from Billups’s house had been fired from the same gun as a shell casing from the scene of the killings of the four Hispanic men, and that the victim’s gun was found in Billups’s house.
Although Billups appears to contend that there was not any evidence that he had the specific intent to kill and rob the victim and that the robbery was a mere afterthought, his intent was a question for the jury to resolve. Based on the evidence presented in this case, including the evidence concerning the robbery and killings of the four Hispanic men three days later, the jury could have reasonably concluded from the facts and circumstances that the robbery began when Billups lured the victim to his house and shot him; that the capital offense was consummated when Billups took the victim’s drugs and gun; that the killing and robbery were part of a continuous chain of events; and that the robbery was intentional and was not a mere afterthought. Therefore, Billups’s argument is without merit.
vni.
Billups’s eighth argument is that the trial court erred in denying his motion to require disclosure of any and all information concerning potential jurors that might be favorable to the defense. We addressed a similar argument in McGowan v. State, 990 So.2d 931, 966-67 (Ala.Crim.App.2003), as follows:
“McGowan contends that the trial court erred in denying his ‘Motion to Require Disclosure of Any and All Information Concerning Prospective Jurors Which May Be Favorable to the Defense,’ in which he asked for disclosure of ‘any reason why a juror would be particularly favorable or unfavorable to the defense, or why a particular juror should not serve.’....
'
“In Dorsey v. State, 881 So.2d 460, 484 (Ala.Crim.App.2001), ajfd in pertinent part, rev’d in part, 881 So.2d 533 (Ala.2003), in affirming the trial court’s denial of the defendant’s motion seeking to have the State disclose favorable information about the prospective jurors, the court reiterated: “‘The State has no duty to disclose information concerning prospective jurors.” ’ (Quoting McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000).) Moreover, ‘ “the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire.” ’ Arthur v. State, 711 So.2d 1031, 1080 (Ala.Crim.App.1996) (quoting Kelley v. State, 602 So.2d 473, 478 (Ala.Crim.App.1992)), aff'd, 711 So.2d 1097 (Ala.1997). See also Williams v. State, 654 So.2d 74 (Ala.Crim.App.1994). Although the trial court denied McGowan’s motions, it permitted the parties practically unlimited voir dire of the venirepersons.
“Furthermore, in specific regard to the trial court’s denial of McGowan’s motion to disclose possibly favorable information, we adopt the approach taken by the court in Lee v. State, 683 So.2d 33, 38 (Ala.Crim.App.1996). In dismissing the appellant’s contention that the trial court violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by denying his ‘Motion to Require Disclosure of Any and All Information Concerning Prospective Jurors *1065 Which May Be Favorable to the Defense,’ the court stated:
“ ‘In his brief to this court, Lee has not alleged that the prosecutor in fact withheld any information whatsoever which would be favorable to his defense. Further, nothing in the record indicates that the prosecutor withheld such information. We find no error in the trial court’s denial of this motion.’
“683 So.2d at 38.”
Also, in McGriff v. State, 908 So.2d 961, 981-82 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004), we held:
“The State has no duty to disclose information concerning prospective jurors. As we stated in Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Kelley v. State, 602 So.2d 473 (Ala.Crim.App.1992)
“ ‘ “This court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady and that a trial court will not be held in error for denying an appellant’s motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977). Cf., Clifton v. State, 545 So.2d 173 (Ala.Cr.App.1988) (the nondis-closed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state’s witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982) (no absolute right to disclosure of criminal records of state’s witnesses).
“ ‘ “Several jurisdictions have similarly held. See, e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982) (trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant’s motion for pretrial discovery of state’s juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990) (defendant is not necessarily entitled to ‘rap sheets’ of prospective jurors); State v. Weiland, 540 So.2d 1288 (La.App.1989) (defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant’s voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989) (no right to discovery of criminal records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Annot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571, § 4(a) (1978), and the cases cited therein.
“ ‘ “Also, the state has no duty to disclose information that is available *1066 to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant’s defense).” ’
“711 So.2d at 1080.”
In this case, when it denied Bill-ups’s motion to require disclosure of any and all information concerning potential jurors that might be favorable to the defense, the trial court stated:
“Motion to disclose all information concerning prospective jurors that may be favorable to the defense. I think that’s — their response objects to that. And I think that’s due to be denied. But it’s kind of the same situation I just addressed. If there’s something that they say that’s wrong during the voir dire and the DA knows about it, they should let everybody know.”
With regard to the motion, the trial court also entered the following order:
“Denied. Attorneys will be allowed to question prospective jurors in detail. Once again, all attorneys are ordered to inform the court and opposing counsel if they are aware of any questions which are not answered truthfully by prospective jurors.”
(C.R. 24.) During the jury selection proceedings, the trial court used a jury questionnaire and also allowed the parties to conduct individual voir dire examination of many of the veniremembers. Finally, Bill-ups has not alleged, and the record does not indicate, that the prosecution withheld any information that would have been favorable to the defense. Accordingly, we do not find that the trial court erred in denying this motion.
IX.
Billups’s ninth argument is that the trial court improperly denied his motion for disclosure of any past and present relationships, associations, and ties between the district attorney and potential jurors. We addressed a similar contention in Belisle v. State, 11 So.3d 256, 277 (Ala.Crim.App.2007), aff'd, 11 So.3d 323 (Ala.2008), as follows:
“Belisle further argues that the circuit court erred in denying his motion to disclose past and present relationships between the district attorney, the former district attorney, the attorney general, and any prospective jurors.
‘When discussing this motion, the circuit court stated:
“ ‘I was going to say, my experience has been, both as a defense lawyer and a prosecutor, that I may know some people out there and I might be able to disclose that relationship that I have with them and then not recognize someone from seven years ago that they remember, hey, I knew him and bla, bla, bla. So I found usually you get a better response by asking a juror.’
“(R. 181-82.) Clearly, the least intrusive method of discovering a juror’s past or present relationship with any of the prosecution team is to ask the prospective jurors during voir dire examination. ‘Discovery matters are within the sound discretion of the trial judge. Williams v. State, 451 So.2d 411 (Ala.Cr.App.1984). The court’s judgment on these matters will not be reversed absent a clear abuse of discretion and proof of prejudice resulting from the abuse. Ex parte Harwell, 639 So.2d 1335 (Ala.1993).’ Parker v. State, 777 So.2d 937, 938 (Ala.Crim.App.2000). There was no abuse of the circuit court’s discretion here.”
*1067 Also, in Travis v. State, 776 So.2d 819, 870 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), we noted:
“Although the trial court denied appellant’s motion, it allowed the parties almost unlimited voir dire of the prospective jurors. Further, the State has no duty to disclose information to the defense that is available from another source; e.g., through voir dire examination.
“Moreover, the appellant fails to name in brief any member of his venire whom he has subsequently learned had had a relationship with any member of the prosecution that might have caused such a person to have a natural bias in favor of the State. The appellant has failed to show in what manner he was prejudiced by the denial of his motion. See Ala. R.App. P., Rule 45. See also, DeFries v. State, 597 So.2d 742 (Ala.Cr.App.1992) (no error in denying motion to disclose past relationships where the same questions were allowed during voir dire at trial).
“Therefore, the appellant’s argument must fail.”
See also McGowan, supra; Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999).
In this case, when it denied the motion for disclosure of any past and present relationships, associations, and ties between the district attorney and potential jurors, the trial court stated:
“Motion for disclosure of any past or present relationships, associations, or ties between district attorney and prospective jurors. I’ve reviewed that as well. I think that’s due to be denied. But what I tend to say in all cases, especially a capital case, is cover whatever you can during voir dire. And I think that all the attorneys are under a responsibility that if there’s something that they know of that’s said that’s incorrect, then they need to correct it. So if they deny some association and the district attorneys know it, I think they are under an obligation to let the Court and let you know that someone said something that wasn’t right. But I’ll deny the motion as it’s written.”
(R. 27-28.) With regard to this motion, the trial court also entered the following order:
“Denied. Attorneys will be given an opportunity to question potential jurors on voir dire. All attorneys are instructed to notify the Court and opposing counsel if they are aware of any jurors who have responded untruthfully during the voir dire process.”
(C.R. 24.) During the jury selection proceedings, the trial court used a jury questionnaire and allowed the parties to conduct individual voir dire examination of many of the veniremembers. Finally, Bill-ups has not alleged that he has subsequently learned that any veniremember or juror had a relationship with any member of the prosecution that might have caused such a person to have a natural bias in favor of the State. Accordingly, we do not find that the trial court erred in denying this motion.
X.
Billups’s tenth argument is that the trial court erred in denying his motion for a change of venue.
“ ‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular ease. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will *1068 be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).’
“Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).”
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). “The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.” Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992). “ ‘Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.’ ” Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).”
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
A.
We must first determine whether the pretrial publicity resulted in “presumptive prejudice.” For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
“Hunt relies on the ‘presumed prejudice’ standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added [in Hunt ]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely applicable, and is reserved for *1069 only ‘extreme situations’. Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.
“Hunt had the burden of showing that ‘prejudicial pretrial publicity’ saturated the community. Sheppard, supra. ‘[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.’ Coleman v. Kemp, 778 F.2d at 1537. ‘Prejudicial’ publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. ‘Publicity’ and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
[[Image here]]
“... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, ‘the appellant must show more than the fact “that a case generates even widespread publicity.” ’ Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“ ‘ “Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accu-sational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].” ’
“Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala. Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
“A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so ‘pervasively saturated’ with prejudicial publicity so as to make the court proceedings nothing more than a ‘hollow formality.’ Rideau, supra.”
Hunt, 642 So.2d at 1043-44. “To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.” United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990).
In support of his motion for a change of venue, Billups argued only about the number of veniremembers who had previously learned something about one or both of the cases against him. He did not present any argument or evidence about the media materials about the cases. Based on the record before us, we cannot conclude that media materials contained prejudicial information or that media attention inflamed or saturated the community so that there was an emotional tide against him. Therefore, the record does not support a conclusion that pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those “extreme situations” that warrant a presumption of prejudice because of pretrial publicity.
B.
We must also determine whether the jury was actually prejudiced against Billups.
*1070 “The ‘actual prejudice’ standard is defined as follows:
“‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961) ]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “render[ed] a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
“Coleman v. Zant, 708 F.2d at 544.”
Hunt, 642 So.2d at 1043.
“Furthermore, in order for a defendant to show prejudice, the ‘ “proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.” Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).’ Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).”
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
Billups has not shown that any pretrial publicity actually prejudiced him. During the voir dire proceedings, the parties individually questioned each venire-member about and extensively covered exposure to the media and/or knowledge about the cases involving him. Many of the veniremembers had heard, read, or seen or knew something about one or both of the cases. However, very few indicated that they could not be fair based on that information, and the trial court excused those veniremembers for cause. The remaining veniremembers indicated that they could set aside any information they had previously obtained about the cases and make a decision based solely on the evidence presented during the trial. Accordingly, Billups has not shown that any of the jurors were actually prejudiced against him.
For these reasons, the trial court did not abuse its discretion in denying Billups’s motion for a change of venue.
XI.
Finally, pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Billups’s conviction and sentence of death. Billups was indicted for and convicted of capital murder because he committed the murder during the course of a robbery. See § 13A-5-40(a)(2), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5 — 53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved four aggravating circumstances — 1) Billups committed the offense while he was under sentence of imprisonment, see § 13A-5-49(l), Ala.Code 1975; 2) Billups had previously been convicted of another capital offense or felony involving the use or threat of violence to the person pursuant to § 13A-5-49(2), Ala.Code 1975; 3) Billups committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, see § 13A-5^49(4), Ala.Code 1975; and 4) the capital offense was one of a series of intentional killings committed by Billups, see § 13A- *1071 5-49(10), Ala.Code 1975. The trial court found that there were not any statutory mitigating circumstances in this case. It also made the following findings as to non-statutory mitigating circumstances:
“1. Testimony that the Defendant’s brother frequently beat him up as a child is regarded as a very minor mitigating factor. This does not weigh heavily in the Court’s consideration. There was no evidence as to the extent of the ‘beatings’ or any injury that the Defendant may have been suffered during the incidents in question. This could have been normal childhood incidents between siblings.
“2. There was also testimony that a boyfriend of the Defendant’s mother hit the Defendant with an extension cord on a few occasions. The Court does not consider this to be a mitigating circumstance since his mother indicated that he stopped the beating immediately and that it was not a continuing problem. The mother indicated that the man in question actually served as a stable father figure for the Defendant during his childhood.
“3. There was also testimony that the Defendant’s father died during his childhood. The Court finds that this is a mitigating factor.
“4. There was also testimony that the Defendant was hit with a brick and knocked out during his childhood. Although there was testimony that this may have resulted in seizures by the Defendant, the Defendant’s mother stated that he grew out of this. There is no evidence or testimony to show that this affected the Defendant in any adverse way for any extended period of time. Therefore, this should not be regarded as a mitigating factor.
“5. The strongest factor in mitigation for Defendant is the jury’s recommendation by a 7 to 5 vote for Life Without The Possibility of Parole. The Court weighs this recommendation strongly in favor of the Defendant, but weight given this factor by the Court is not as great as if a unanimous recommendation for Life Without Parole had been made.”
(C.R. 32-38.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced Billups to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A — 5—53(b)(3), Ala.Code 1975, we must determine whether the sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Billups committed the murder during the course of a robbery. Similar crimes are being punished by death throughout this state. See Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected Billups’s substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
*1072 Accordingly, we affirm Billups’s convictions and sentences.
AFFIRMED.
WINDOM and MAIN, JJ., concur. KELLUM, J., concurs in the result. WELCH, J., dissents, with opinion.

. At one point, Billups makes an oblique reference to the admission of evidence about prior robbery convictions. However, he focuses his argument on the alleged error in admitting evidence about the murders of the four Hispanic men. Therefore, we question whether he actually raises a separate argument about the robbery convictions. We also note that he did not object at trial and that, therefore, any argument is reviewable only for plain error. See Rule 45A, Ala. R.App. P. We note that there was only one brief reference to prior armed robbery convictions during his testimony, that details about those convictions were not admitted, that the convictions were not emphasized in any way, and that the trial court repeatedly instructed the jury as to the proper use of evidence about prior convictions. We also note that Billups was paroled on June 25, 2001, and that his parole was set to expire on January 20, 2013. Therefore, we do not find that there was any plain error in this regard.

. Billups also lists a firearms expert in his issue statement, but he does not include any argument in that regard. Therefore, his brief does not comply with the requirements of Rule 28(a)(10), Ala. R.App. P„ and we will not address it.

. In his brief to this court, Billups argues "that the trial court should have reviewed grand jury proceedings at a minimum to ensure that [he] received a fair and impartial trial in his death penalty case.” (Billups’s brief at p. 34.) However, as set forth herein, the trial court specifically stated that it would do just that, and there is not any indication in the record that it did not do so. Therefore, Billups’s argument to the contrary is not supported by the record.